**UNITED STATES of America**

**v.**

**STOLT–NIELSEN S.A., et al.**

**Criminal Action No.  06–cr–466.**

United States District Court,
E.D. Pennsylvania.

· Nov. 30, 2007.

See, also, 2007 WL 4225668.

Antonia R. Hill, United States Dept. of Justice, Philadelphia, PA, for United States of America.

Christopher M. Curran, J. Mark Gidley, George L. Paul, Peter J. Carney, Lucius B. Lau, Jaime M. Crowe, Eileen Marie Cole, Danielle E. Karst, White & Case LLP, Washington, DC, Martin Michael Toto, White & Case LLP, New York City, William H. Roberts, Blank Rome Comisky & McCauley LLP, Philadelphia, PA, for Stolt-Nielsen S.A., Stolt-Nielsen Transportation Group, Ltd. (Liberia) and Stolt-Nielsen Transportation Group, Ltd. (Bermuda).

Roberta D. Liebenberg, Allen D. Black, Gerard A. Dever, Fine Kaplan & Black, Philadelphia, PA, Thomas A. Bergstrom, Malvern, PA, for Richard B. Wingfield.

Elkan Abramowitz, Jonathan S. Sack, Andrew J. Schell, Elizabeth Haines, Morvillo, Abramowitz, Grand, Iason, Anello & Bohrer, P.C., New York City, Walter M.

Phillips, Jr., Obermayer Rebmann Maxwell & Hippel LLP, Philadelphia, PA, for Samuel Cooperman.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BRUCE W. KAUFFMAN, District Judge.

**AND NOW,** this day of November, 2007, after an evidentiary hearing and careful review of the record, including the parties' post-hearing supplemental briefs, exhibits, and proposed findings of fact and conclusions of law, the Court makes the following **Findings of Fact and Conclusions of Law:**

### FINDINGS OF FACT

#### I. Background

1. Defendant Stolt–Nielsen S.A. ("SNSA"), a Luxembourg corporation, is the parent of the Stolt–Nielsen Transportation Group ("SNTG") and all the Stolt–Nielsen entities (collectively, "Stolt–Nielsen"). SNTG is a parcel tanker shipping company.

2. In 2002, Defendant Samuel A. Cooperman ("Cooperman") was Chairman of SNTG.

3. In 2002, Defendant Richard B. Wingfield ("Wingfield") was Managing Director of Tanker Trading at SNTG.

4. During the period relevant to this case, Stolt–Nielsen's primary competitors in the parcel tanker shipping industry were Odfjell Seachem ("Odfjell"), a Norwegian company, and Jo Tankers BV ("Jo Tankers"), a Dutch company.

#### II. The Conspiracy Is Formed

5. In August 1998, Stolt–Nielsen representatives Cooperman and Andrew Pickering met in SNTG's London office with

Odfjell executives Bjorn Sjaastad ("Sjaastad"), Erik Nilsen ("Nilsen"), and Atle Knutsen and agreed not to compete for one another's customers on deep-sea trade routes. *See Testimony of John Nannes ("Nannes")* GX–5, at 165–67; *Testimony of Andrew Pickering ("Pickering")* 5/31/07, at 153; Testimony of Atle Knutsen *("Knutsen")* 6/13/07, at 16–17.

6. After the meeting, Stolt–Nielsen and Odfjell exchanged customer allocation lists to facilitate the agreement, sometimes referred to as "coop" or "status quo." *Pickering* 5/31/07, at 135–39; *Testimony of William Humphreys ("Humphreys")* 6/4/07, at 144. As part of the agreement, Odfjell and Stolt–Nielsen would refrain from bidding or competing for customers and trade routes allocated to the other party. *Pickering* 5/31/07, at 139, 197.

7. During this period, SNTG also developed an informal, "ad hoc" arrangement with Jo Tankers, whereby the two companies agreed not to compete for each other's customers on certain trade routes. The companies did not exchange customer lists. *See Testimony of Hendrikus Van Westenbrugge ("Van Westenbrugge")* 6/14/07, at 79; *Pickering* 5/31/07, at 135–36.

8. Stolt–Nielsen's agreement with Odfjell and Jo Tankers covered only deep-sea contracts, and generally excluded spot cargos, new business, and regional contracts. *See Testimony of Raymond Long ("Long")* 6/5/07, at 88–90; *Testimony of James Fleming ("Fleming")* 6/5/07, at 38–39.

9. Prior to 2001, Pickering, who at the time managed the Tanker Trading division, was responsible for implementing the agreement with Odfjell and Jo Tankers with the help of business directors and other lower-level employees. At that time, employees of Stolt–Nielsen and Odfjell engaged in frequent anticompetitive communications. *See Pickering* 5/31/07, at 134–35; *Fleming* 6/4/07, at 186–87.

10. In February 2001, Wingfield was transferred to Stolt–Nielsen's Greenwich, Connecticut office, where he replaced Pickering as Managing Director for Tanker Trading. *See Testimony of Wingfield* 6/5/07, at 107–08.

11. After Wingfield assumed the position, he sought to limit anticompetitive contacts and discussions between lower-level employees of SNTG and their counterparts at Odfjell and Jo Tankers, and designated himself and Bjorn Jansen ("Jansen"), his subordinate, to handle any collusive contacts. *See Testimony of Brian Cleary ("Cleary")* 6/1/07, at 161–62; *Fleming* 6/5/07, at 10–11.

### III. O'Brien "Discovers" the Conspiracy

12. In January 2002, Paul O'Brien, then Senior Vice–President and General Counsel of Stolt–Nielsen, found a copy of an April 10, 2001 memorandum from Jansen to Wingfield, which had been left anonymously on his desk. *See GX–2; Nannes* GX–6, at 70; *Testimony of Paul O'Brien ("O'Brien")* 6/14/07, at 33–34. The memo weighed the advantages and disadvantages of competing with Odfjell and concluded that "continued coop is preferable." GX–2; *see Testimony of Jansen* 6/13/07, at 89–91.

13. In February 2002, O'Brien reported his concerns about antitrust compliance at Stolt–Nielsen to Cooperman. Cooperman promptly met with O'Brien to address his concerns. *See Nannes* GX–5, at 113, 129.

14. O'Brien resigned from Stolt–Nielsen on March 1, 2002. *See* GX–8. In June 2002, he filed a constructive-discharge lawsuit against Stolt–Nielsen and Cooperman in Connecticut State Court. *O'Brien v. Stolt–Nielsen Transp. Group Ltd.,* No. 02–0190051–S (Conn.Super. Ct., filed June

18, 2002); GX–10A; *Testimony of Richard Fisher ("Fisher")* 6/11/07, at 12. The complaint alleged "ongoing criminal conduct" in violation of the antitrust laws. GX–10A, at ¶¶ 8, 15.

15. Because O'Brien left the company in March 2002, he was not in a position to monitor Stolt–Nielsen's antitrust compliance in the relevant March–November 2002 period. *See* GX–8.

16. Sometime after June 2002, Fisher, a member of SNSA's Board of Directors, obtained a copy of O'Brien's complaint. *See Fisher* 6/11/07, at 12–14. On August 1, 2002, Cooperman contacted Fisher to discuss the complaint. Fisher requested that it be addressed at the August board meeting of SNSA. *Fisher* 6/11/07, at 15–16.

17. On August 14, 2002, Cooperman addressed the Board and reported that Stolt–Nielsen was participating in no ongoing antitrust violations. *See Fisher* 6/11/07, at 64 (Cooperman gave an "earnest report" on "ongoing activity from early 2002 going forward").

### IV. Stolt–Nielsen Takes "Prompt and Effective Action" to Terminate its Part in the Conspiracy

18. In response to the concerns raised by O'Brien, beginning in late February 2002 Stolt–Nielsen instituted a comprehensive and revised antitrust compliance policy ("Antitrust Compliance Policy") in a prompt effort to terminate its part in the anticompetitive activity that had been reported by O'Brien.

19. As part of the new policy, Stolt–Nielsen issued and distributed a revised Antitrust Compliance Handbook (the "Handbook"). *See* DX–334.

20. The Handbook stressed the importance of antitrust compliance, expressly prohibited collusive contacts with competitors, required that any contact with competitors other than routine sublet and time charters be approved in advance by the Chief Executive Officer, and clarified that violation of any of its provisions would result in demotion or termination. *See* DX–334.

21. On or about March 11, 2002, Cooperman and Reginald Lee ("Lee"), then CEO of SNTG, provided Wingfield with the Handbook, and ordered him to strictly comply with it and to disseminate it to Stolt–Nielsen employees, "pool partners" and competitors. Wingfield committed to adhere strictly to the new policy. *See Wingfield* 6/5/07, at 134–36.

22. In late February and early March 2002, Cooperman and Lee introduced the Antitrust Compliance Policy to Stolt–Nielsen's Business Directors. Cooperman met individually with each Business Director and stated that all collusive activity was to cease fully and immediately and that there would be severe consequences for non-compliance. *See Testimony of P. Wayne Harrison ("Harrison")* 5/31/07, at 210–11; *Humphreys* 6/4/07, at 160–62; *Long* 6/5/07, at 63–64; *Cleary* 6/1/07, at 120, 136, 148–50; *Jansen* 6/13/07, at 99, 159, 230–32.

23. On or about March 12, 2002, a Business Directors meeting was held for the purpose of discussing the Handbook and Antitrust Compliance Policy. *Cleary* 6/1/07, at 54–55; *Testimony of Richard Judd ("Judd")* 6/1/07, at 173–76. The meeting was attended by Lee, who emphasized the need for strict compliance. *See Testimony of Thomas Confrey ("Confrey")* 6/1/07, at 208–09.

24. In late March and April 2002, Stolt–Nielsen held a series of mandatory seminars designed to inform employees about the Antitrust Compliance Policy. On April 24, 2002, Gary Sesser of the law firm of Carter, Ledyard & Milburn conducted two presentations in Greenwich, CT. *Pickering* 5/31/07, at 112; *Harrison*

5/31/07, at 218–20. The seminars were attended by Cooperman and Lee, as well as all regional managing directors worldwide. *See Pickering* 5/31/07, at 112–13; DX–354; DX–389; DX–390.

25. All seminar attendees were required to sign in and undergo a roll-call. *Pickering* 5/31/07, at 112–13; *Harrison* 5/31/07, at 219; DX–389; DX–390.

26. Mandatory seminars were also held in Houston, Rotterdam, and Singapore. *See Wingfield* 6/5/07, at 159–60; DX–356; *Testimony of Ronald Soffree ("Soffree")* 6/4/07, at 42–43; *Pickering* 5/31/07, at 108–09; DX–353; DX–407.

27. During each seminar, management conveyed the message that all anticompetitive activity must cease immediately. *See Pickering* 5/31/07, at 110; *Soffree* 6/4/07, at 43; *Wingfield* 6/5/07, at 160–61.

28. On March 15, 2002, Wingfield distributed the Handbook to parcel tanker operations and chartering personnel in the United States. *See* DX–355.

29. On March 19, 2002, Wingfield presented Stolt–Nielsen's Antitrust Compliance Policy to the chartering and operational staff at a meeting in Greenwich, CT. *Wingfield* 6/5/07, at 137–38; *Humphreys* 6/4/07, at 65–66.

30. Lee and Cooperman directed the distribution of the Handbook to Stolt–Nielsen employees worldwide, including Europe and Asia. *See* DX–318; *Pickering* 5/31/07, at 105–07; *Soffree* 6/4/07, at 41; DX–353.

31. In May 2002, Stolt–Nielsen required all relevant employees to sign certifications representing as follows:

1. I have received, read and am familiar with the revised edition (Mar. 11.02) of the SNTG Antitrust Compliance Handbook.

2. I attended [one of] the Antitrust Compliance Seminar[s] . . .

3. I will comply with all the terms and provisions of the Antitrust Compliance Policy.

4. I confirm that I am not aware of any violations of the Antitrust Compliance Handbook existing at this time.

5. I will promptly report any violations, or attempted violations, of the Policy to SNTG Legal Counsel.

By July 31, 2002, 134 employees had signed the certifications. *See* DX–100 to DX–100.132; *Long* 6/5/07, at 65–66; *Pickering* 5/31/07, at 114; *Cleary* 6/1/07, at 60; *Harrison* 5/31/07, at 220–21.

32. The Antitrust Compliance Policy was successful in transforming Stolt–Nielsen's corporate culture and reforming its business practices. The policy heightened employees' alertness to antitrust compliance, and drastically altered the manner in which employees conducted business. *See Harrison* 5/31/07, at 221; *Pickering* 5/31/07, at 204; *Fleming* 6/4/07, at 191 ("For me, it was 180–degree turnaround in the way that the company had been behaving prior to that."); *Confrey* 6/1/07, at 214–15 ("When this policy came into effect, everything changed. It was a tornado . . ."). Attendance at industry conferences and social events attended by competitors was restricted and required prior authorization. *See Harrison* 5/31/07, at 218, 226; *Judd* 6/1/07, at 183; *Soffree* 6/4/07, at 45–46.

33. After March 2002, competitors continued to initiate anticompetitive contacts, but Stolt–Nielsen employees repeatedly refused to engage in collusive discussions with them. Those employees who were contacted by Odfjell reported such calls to their superiors in compliance with the Antitrust Compliance Policy. *See Long* 6/5/07, at 66–67; *Humphreys* 6/4/07, at 89–90; *Fleming* 6/4/07, at 192–94, 196–97.

34. After March 2002, Stolt–Nielsen employees were instructed to turn in or discard their copies of the customer allocation lists. *See Long* 6/5/07, at 66.

35. In March 2002, Wingfield returned two European cell phones that Odfjell had suggested be used specifically to facilitate collusive contacts. *Wingfield* 6/5/07, at 140–41; DX–12.

36. Prior to March 2002, the customer-allocation conspiracy required the participation of personnel at various levels within Stolt–Nielsen. *See Pickering* 5/31/07, at 135. Two of those employees testified that it would have been impossible for anticompetitive contacts to have continued without their knowledge. *See Confrey* 6/1/07, at 227–28; *Fleming* 6/4/07, at 212–13. Dr. Barry Harris ("Harris"), former Deputy Assistant Attorney General for Economics at the Division, explained that the revised Antitrust Compliance Policy effectively "severed" the internal company communication pathways—i.e., the links between those who were in contact with competitors and those responsible for bidding—that made it possible for Stolt–Nielsen to implement the customer allocation conspiracy. *See Testimony of Harris* 6/20/07, at 24–28.

37. After March 2002, Stolt–Nielsen and Odfjell competed for contracts that previously had been subject to collusion. *See Long* 6/5/07, at 70–72; DX–4009.

38. Between March and November 2002, Stolt–Nielsen succeeded in winning a number of contracts allocated to Odfjell prior to March 2002. Examples include (1) the BP contract from U.S. Gulf to Mexico, which Stolt–Nielsen won in April 2002, *Fleming* 6/4/07, at 203; DX–2706, at SN–E–0072029; and (2) the Dow Chemical Contract from U.S. Gulf to Mexico, which Stolt–Nielsen won in October 2002. *Fleming* 6/4/07, at 203; DX–3172; GX–53.

39. Between March and November 2002, Odfjell competed for and won a number of contracts previously allocated to Stolt–Nielsen. These included (1) the Rhodia contract from Europe to Asia, *Cleary* 6/1/07, at 92; *Testimony of Nilsen* 6/15/07, at 135; *Nilsen* 6/19/07, at 40; and (2) the Oxiquim contract from U.S. Gulf to Chile and Peru to Chile. *Nilsen* 6/19/07, at 50; *Long* 6/5/07, at 77; DX–4066, at OE041016.

40. In February 2002, Trond Storli ("Storli"), an Odfjell employee, obtained a copy of the 1998 combined customer allocation list and threatened to expose the conspiracy unless Odfjell paid him. *See Testimony of Jarle Haugsdal* ("Haugsdal") 6/12/07, at 233–36; *Testimony of Sjaastad* 6/20/07, at 147–48. On March 20, 2002, Odfjell and Storli entered into an agreement whereby Storli received $50,000. The agreement required Storli to certify that he was unaware of any violation of law by Odfjell or its employees. *See* Wingfield Ex. 119, at OD 0094958–59.

41. As a result of Storli's threats, Haugsdal, an Odfjell executive, told the Odfjell vice presidents to destroy copies of the customer allocation lists. *Haugsdal* 6/12/07, at 241–44.

42. Odfjell sought to conceal its involvement in the conspiracy when Haugsdal was quoted in a February 20, 2003 *Wall Street Journal* article stating "we are of the firm opinion that we in our business dealings have always acted well within the relevant competition laws." DX–1353; *Haugsdal* 6/12/07, at 138–39, 134–35.

## V. Contacts with Competitors: March–November 2002

### A. The NPRA Conference

43. On March 26, 2002, Wingfield met with Odfjell executives Sjaastad and Morten Nystad ("Nystad") at the National Petroleum Refiners Association ("NPRA")

conference in San Antonio and informed them that in response to antitrust concerns raised by its in-house counsel, Stolt–Nielsen had adopted and issued a new antitrust policy. *Wingfield* 6/5/07, at 142–43.

44. During the meeting, Wingfield informed Sjaastad and Nystad that Stolt–Nielsen would comply with the new policy without exception, and that its participation in the prior customer allocation conspiracy must end. *See Wingfield* 6/5/07, at 142–44; *Wingfield* 6/6/07, at 33; *Sjaastad* 6/20/07, at 114.

45. There was no discussion of specific customers at the meeting. However, Wingfield explained that the new antitrust policy did not require Stolt–Nielsen to go after all of Odfjell's customers, nor did Stolt–Nielsen have the capacity to do so. *See Wingfield* 6/5/07, at 143–46; *Jansen* 6/13/07, at 210–12.

46. Sjaastad asked Wingfield to send him a copy of the Handbook, and Wingfield e-mailed it to him upon return to his office. *Wingfield* 6/5/07, at 147; DX–363.

47. Sjaastad subsequently sent Haugsdal a copy of the Handbook. Haugsdal forwarded the Handbook to Odfjell's outside law firm for review. *See Haugsdal* 6/12/07, at 116–20, 125–26.

48. There is no credible evidence that Wingfield told Sjaastad and Nystad that it was "business as usual" or that "the status quo would prevail." *Wingfield* 6/5/07, at 111–12.

49. On the evening of March 26, 2002, Wingfield, Jansen and Cleary had a dinner meeting with Jo Tankers executives Van Westenbrugge and Hugo Finlay ("Finlay") at a restaurant in San Antonio. *Wingfield* 6/5/07, at 148–50; *Van Westenbrugge* 6/14/07, at 180–81.

50. The purpose of the meeting was to discuss a co-service agreement between the two companies, a lawful subject for discussion. *Wingfield* 6/5/07, at 149; *Van Westenbrugge* 6/14/07, at 180–84; *Cleary* 6/1/07, at 77, 115; *Jansen* 6/13/07, at 103.

51. During the meeting, Wingfield requested that Finlay and Cleary leave the table so that he could speak with Van Westenbrugge in private. *See Wingfield* 6/5/07, at 150–51. Wingfield then told Van Westenbrugge that as a result of antitrust concerns raised by its in-house counsel, Stolt–Nielsen had issued a new Antitrust Compliance Policy that would be strictly enforced. *Wingfield* 6/5/07, at 152–54; *Van Westenbrugge* 6/14/07, at 182–84.

52. Finlay was not present at the table when Wingfield raised the subject of Stolt–Nielsen's Antitrust Compliance Policy, and therefore had no personal knowledge of the discussion. *Cleary* 6/1/07, at 78–79; *Wingfield* 6/5/07, at 150–52; *Van Westenbrugge* 6/14/07, at 181, 212.

53. Van Westenbrugge requested a copy of the Handbook, which Wingfield e-mailed him upon return to his office. *Wingfield* 6/5/07, at 153–54; *Van Westenbrugge* 6/14/07, at 182, 215; DX–365.

54. Wingfield reported his discussion with Van Westenbrugge to Lee on the day after the dinner meeting. *Wingfield* 6/5/07, at 156.

55. There is no credible evidence that Wingfield stated or suggested that the *ad hoc* customer allocation arrangement between Stolt–Nielsen and Jo Tankers would continue. *See Van Westenbrugge* 6/14/07, at 226.

## B. The "Luigi's" Meeting in London

56. On June 13, 2002, Wingfield and Jansen met Odfjell executives Nilsen and Haugsdal for dinner at Luigi's restaurant in London. *Wingfield* 6/5/07, at 166–68; *Jansen* 6/13/07, at 112–14.

57. The purpose of the meeting was to discuss formalizing a lawful sublet arrangement that was in place between Stolt–Nielsen and Odfjell on the Brazil–Africa–Japan ("BAJ") trade lane in order to adhere more strictly to Stolt–Nielsen's Antitrust Compliance Policy. *See Wingfield* 6/5/07, at 165–67; *Jansen* 6/13/07, at 149–50; *Nilsen* 6/15/07, at 125–26, 188; *Nilsen* 6/19/07, at 18, 115–17.

58. After the meeting, Wingfield reported to Lee that Odfjell would be proposing wording for a formal co-service agreement. DX–419; *Wingfield* 6/5/07, at 173–75.

59. Odfjell ultimately decided not to accept Stolt–Nielsen's request to formalize the sublet agreement. *See* DX–625; *Haugsdal* 6/12/07, at 174–75.

60. There is no credible evidence of any collusive discussions or agreements reached at the dinner meeting, or that Wingfield stated that "it will be business as usual." *See Wingfield* 6/5/07, at 111–12.

### C. The Heathrow Meeting

61. On October 18, 2002, Wingfield and Jansen met with Haugsdal and Nilsen at the bar of the Hilton Hotel at Heathrow Airport. *See Wingfield* 6/5/07, at 180; *Haugsdal* 6/12/07, at 102, 224.

62. The purpose of the meeting was to discuss complaints by Stolt–Nielsen customer, Dow Chemical, regarding operational issues on the BAJ trade lane, including recurring late shipments. *See* DX–657; *Wingfield* 6/5/07, at 176–77. Wingfield wanted to address Odfjell's poor performance on scheduling of sublets before a meeting with Dow on October 30, 2002. *Wingfield* 6/5/07, at 176–77; *Jansen* 6/13/07, at 124–25; DX–692, at SNTG–E–011932; DX–705.

63. Communications with Odfjell regarding sublets were permissible under the Antitrust Compliance Policy. *See*

*Wingfield* 6/6/07, at 105–06; DX–334, at SNTG–436250.

64. During the meeting, Jansen made a passing comment about competition on Equatorial, a contract involving cargo shipped from Asia to South Africa that previously had been allocated to Stolt–Nielsen. *Jansen* 6/13/07, at 153–55; *Wingfield* 6/5/07, at 184–85. Neither Haugsdal nor Nilsen recalled the comment, and there is no evidence that Odfjell took any action in response to it. *Haugsdal* 6/12/07, at 220; DX–4114 at ¶ 11.

65. There is no credible evidence that the Heathrow meeting was conspiratorial in nature. *See Wingfield* 6/5/07, at 187; *Jansen* 6/13/07, at 153.

### D. The Sasol Bid

66. In the Summer and Fall of 2002, Stolt–Nielsen, with the support of Wingfield and other members of senior management, competed vigorously for the business of Sasol, a customer previously allocated to Odfjell. *See Humphreys* 6/4/07, at 78; *Wingfield* 6/6/07, at 108–09; *Jansen* 6/13/07, at 123; *Sjaastad* 6/20/07, at 122.

67. Stolt–Nielsen submitted a highly competitive initial bid to Sasol on September 16, 2002. *See Humphreys* 6/4/07, at 77–78; DX–2529; DX–2832.

68. On October 11, 2002, Stolt–Nielsen submitted a highly competitive final bid to Sasol. *See Humphreys* 6/4/07, at 78, 90.

69. In an effort to gain a competitive advantage over Odfjell, and with the support of management including Wingfield, Stolt–Nielsen entered into a joint venture with a company called Southern Tankers as part of the South African Government's "black-empowerment initiative," a program designed ·to engage the country's black population in economic development. *See*

*Humphreys* 6/4/07, at 75–76; DX–2487; GX–72.

70. Wingfield, with the support of his superiors, was instrumental in formulating the black empowerment strategy. *Testimony of Nils Vogth Eriksen ("Vogth Eriksen")* 6/4/07, at 29; *Humphreys* 6/4/07, at 75–76.

71. On September 30, 2002, Lee sent an e-mail message to Niels Stolt–Nielsen, CEO of SNSA reporting about Stolt–Nielsen's prospects of winning the Sasol contract as a result of the black empowerment initiative. GX–72, at SNTG–E–011146. On October 1, 2002, Niels Stolt–Nielsen replied, congratulating Lee and Cooperman on their "creative thinking." GX–72, at SNTG–E–011145. Lee forwarded the message to Wingfield, who replied "thank you!! Let's hope it works." GX–72, at SNTG–E–011144. Niels Stolt–Nielsen then inquired: "which contracts will [Odfjell] retaliate on?" to which Wingfield responded: "good question and the truthful answer is [I] don't know ... what we will say publicly (and [Odfjell] will pick up on this) is that this is regional business and not part of main fleet business—not really true but hopefully we can avoid a war in the near term." *Id.* The discussion, which reveals a sincere will to win the Sasol contract and a concern about "retaliation," manifests a genuine commitment to competition on the Sasol contract, accompanied by a desire to avoid a full-fledged war with Odfjell—a lawful objective.

72. Upon learning about Stolt–Nielsen's competitive bid to Sasol, Odfjell executives called Stolt–Nielsen to complain and demand that the bid be withdrawn. Specifically, on the morning of October 11, 2002, Nilsen called Wingfield. *Wingfield* 6/6/07, at 60.

73. Wingfield refused to withdraw the bid or to answer questions about it, as confirmed in his contemporaneous journal notes: "told him won't discuss." *Wingfield* 6/6/07, at 93, 103–04; GX–26B, at SNT–0005747; *Haugsdal* 6/12/07, at 100, 109; *Nilsen* 6/15/07, at 144; *Nilsen* 6/19/07, at 86.

74. Later on the morning of October 11, 2002, Nilsen and Haugsdal together called Wingfield and again demanded that he withdraw the Sasol bid. *Wingfield* 6/6/07, at 63–64; *Haugsdal* 6/12/07, at 100, 109; *Nilsen* 6/15/07, at 144, 197. Wingfield again refused to do so. *See Wingfield* 6/6/07, at 63–65, 108; *Haugsdal* 6/12/07, at 100.

75. After submission of the final bid, Nilsen called Wingfield yet again, this time while Humphreys was in Wingfield's office. *Wingfield* 6/6/07, at 64–65; *Humphreys* 6/4/07, at 95–96.

76. Despite Odfjell's repeated protests and demands, Wingfield refused to instruct his subordinates to withdraw Stolt–Nielsen's bid for the Sasol contract. *See Humphreys* 6/4/07, at 96; *Wingfield* 6/6/07, at 108.

77. On October 11, 2002, Cooperman spoke with Humphreys, who oversaw the bidding on the Sasol contract and reported that Stolt–Nielsen's bid was aggressive. *See Humphreys* 6/4/07, at 124–25. During the conversation, Humphreys informed Cooperman that Odfjell had called Wingfield to complain about competition from Stolt–Nielsen on the Sasol contract. *Humphreys* 6/4/07, at 92. Cooperman then visited Wingfield's office to inquire about the bid, and was assured that Stolt–Nielsen's chances of winning the contract were good. *See Wingfield* 6/6/07, at 62–63.

78. The evidence reveals that Sasol gave Odfjell a "last look," and that Odfjell reduced its rates significantly in response to the information it received from Sasol, thus winning the bid. *See* DX–4173; DX–1571, at OD0088746; *Nilsen* 6/19/07, at

105–10; DX–1221, at OD0090960; *compare* DX–2525, at SNTG–SASOL–000108 *with* DX–2539, at SNTG–SASOL–000176.

79. There is no credible evidence that Wingfield ever revealed Stolt–Nielsen's rates to Odfjell or that there was any collusion on the Sasol contract. *See Wingfield* 6/5/07, at 189–90; *Wingfield* 6/6/07, at 65; *Humphreys* 6/4/07, at 96; *Jansen* 6/13/07, at 123, 149.

80. Odfjell's contemporaneous internal bid analyses reveal that Odfjell decreased its initial bid by over 7 percent, and not by "2 to 3 percent" as Haugsdal testified, discrediting the allegation that Wingfield had "leaked" Stolt–Nielsen's bid rates to Odfjell. *See Haugsdal* 6/12/07, at 101, 210–16; DX–2543.

### E. The SK Contract

81. In 2001, Stolt–Nielsen entered into a contract with SK Corp. that was scheduled to expire in June 2003. *Harrison* 5/31/07, at 234–35; GX–266.

82. Harrison, Business Director for Home Bound Return, had final authority to determine the rates Stolt–Nielsen would offer to SK in 2002. *Harrison* 5/31/07, at 236–37.

83. Wingfield was not involved in rate negotiations with SK, nor did he determine the rates to be offered to SK. *See Wingfield* 6/6/07, at 71; *Harrison* 5/31/07, at 237–38.

84. The Division alleges that Wingfield contacted Nilsen in June 2002 and gave him price guidance to ensure that Odfjell would not compete for the SK contract. Nilsen is the only witness who testified that a June 2002 call with Stolt–Nielsen occurred, but could not recall any details about the alleged call, including the identity of the person with whom he allegedly spoke. *See* Nilsen 6/15/07, at 195. His testimony was contradicted by ample credible testimony and contemporaneous evidence of fierce competition.

85. On June 17, 2002, SK's broker notified Hallvard Edvardsdal ("Edvardsdal") of Odfjell that SK had a contractual commitment with Stolt–Nielsen through June 2003. *See* GX–57, at OD0077412–413. If SK were to breach the Stolt–Nielsen contract by not shipping the minimum volume required, SK would have had to pay deadfreight, a contractual penalty. *See Testimony of Edvardsdal* 6/15/07, at 82. Odfjell informed SK that Odfjell was not able to make an offer to take over the Stolt–Nielsen contract due to delays on new ships being built in Poland. *See* GX–57, at OD0077412.

86. In the Fall of 2002, SK approached Odfjell to solicit bids. The contract included the ports of New Orleans and Houston. Because of Odfjell's limited port capabilities in New Orleans, it submitted a bid only for the Houston portion of the contract. *See Edvardsdal* 6/15/07, at 16, 78; GX–64, at OD0077429. In December 2002, SK's broker told Edvardsdal that SK could not accept Odfjell's offer because SK could not find a shipowner willing to carry just the New Orleans portion. DX–1993, at OD0077433.

87. Stolt–Nielsen's regular service to and terminal capabilities in both Houston and New Orleans, as well as its status as an incumbent, gave it a competitive advantage over Odfjell. *See Harrison* 5/31/07, at 243; *Edvardsdal* 6/15/07, at 66–67.

88. On November 18, 2002, SK's broker gave Stolt–Nielsen, the incumbent, a "last look." Thus, while other bidders were required to submit their bids by November 15, Stolt–Nielsen was permitted to submit its bid on November 20, 2002. *See* DX–1912; DX–2796.

89. Based on the information provided by the broker, Harrison was led to believe

that Odfjell's bid was substantially lower than it turned out to be. In response to the competition from a number of carriers, Harrison and the bid team reduced Stolt–Nielsen's rates, and on November 20, 2002, submitted its bid. *See Harrison* 5/31/07, at 242–43; *Harrison* 6/1/07, at 23–24; DX–1912; DX–2796.

90. Stolt–Nielsen faced stiff competition on the SK contract from Odfjell, Aurora Tankers, Jo Tankers and MTMM, and managed to retain the contract only after a 25% rate reduction and other valuable concessions to SK. *Harrison* 5/31/07, at 243, 246–47; *Harrison* 6/1/07, at 35–36.

91. The Division alleges that Wingfield contacted Nilsen in November 2002 to ensure that Odfjell would not compete for the SK contract. There is no credible evidence that Wingfield sought protection against competition from Odfjell or that the SK contract was "rigged." *Harrison* 5/31/07, at 255–56; *Jansen* 6/13/07, at 156; *Wingfield* 6/6/07, at 78.

92. Nilsen testified that in response to Wingfield's request, he added $2 or $3 to Stolt–Nielsen's targeted rate, but as he later admitted and as the bidding documents confirmed, Odfjell's bid was only fifty cents above Stolt–Nielsen's target bid as of November 15, 2002. *Nilsen* 6/15/07, at 159; *Nilsen* 6/19/07, at 36–37.

93. Nilsen's May 2004 Grand Jury declaration does not mention any alleged collusion on SK in June 2002. *Nilsen* 6/15/07 at 195–96; DX–4114.

94. Nilsen's testimony to the Korea Fair Trade Commission ("KFTC") regarding SK was also devoid of any mention of collusion with Stolt–Nielsen in June 2002. *Nilsen* 6/19/07, at 19–21; DX–524, at OD0094666.

### F. The Pecten Contracts

95. In the Fall of 2002, two Pecten contracts were on the market: the "large"

Pecten contract from the U.S. Gulf to a number of ports in the Far East, and the Chinese Outports contract from the U.S. Gulf to two ports in China. While Jo Tankers was competing for the large Pecten contract, Stolt–Nielsen was competing for the smaller contract. *See Cleary* 6/1/07, at 83–87.

96. Stolt–Nielsen did not have the capacity to compete with Jo Tankers for the large Pecten contract. As a result, Stolt–Nielsen was not asked to bid on the large Pecten contract. *See Cleary* 6/1/07, at 83–87, 90; DX–1596; DX–1575.

97. On November 1, 2002, after Pecten removed the outports of Hong Kong and Xiao Hu Dao from the large Pecten contract, Stolt–Nielsen submitted a bid for those two Chinese ports. *Cleary* 6/1/07, at 87–90; DX–1716 ¶ 6; DX–1709.

98. The Indictment charges that in Fall 2002, Stolt–Nielsen agreed not to compete for a contract with Pecten, and in exchange Jo Tankers agreed not to compete for a contract with Stolt–Nielsen's customer SK Corporation. *See* Indictment ¶ 6(n).

99. Wingfield was not involved in determining rates on Stolt–Nielsen's bid for the Chinese Outports contract. *See Cleary* 6/1/07, at 89; *Jansen* 6/13/07, at 157.

100. There is no credible evidence that Stolt–Nielsen agreed not to compete for a contract with Pecten as part of a *quid pro quo* arrangement with Jo Tankers. *See Van Westenbrugge* 6/14/07, at 202–03, 222 ("[T]he two events are completely separate."); GX–63, at JO092908; *Wingfield* 6/5/07, at 188–89; *Harrison* 6/1/07, at 26.

101. The evidence reveals that Jo Tankers decided not to bid for the SK contract for independent business reasons, anticipating that Stolt–Nielsen would be

receiving a "last look." *See Van Westenbrugge* 6/14/07, at 200–02.

102. There is no evidence that after March 2002, Cooperman, Wingfield, Jansen, or any other Stolt–Nielsen executive instructed any subordinate to withhold a bid or to "bid high" to participate in a customer allocation.

### VI. Stolt–Nielsen Contacts John Nannes

103. In November 2002, Cooperman contacted the SNTG Board of Directors and requested authorization to conduct an independent investigation of Stolt–Nielsen's antitrust compliance. Authorization was given, and Stolt–Nielsen retained John Nannes, former Deputy Assistant Attorney General for the Antitrust Division and a partner of the law firm Skadden, Arps, Slate, Meagher & Flom LLP, to conduct the investigation, along with SNTG's antitrust counsel at Carter, Ledyard & Milburn. *See Nannes* GX–5, at 107, 131.

104. On November 22, 2002, Nannes met with Cooperman, Gary Sesser of Carter, Ledyard & Milburn, and Alan Winsor, Stolt–Nielsen's general counsel. *Nannes* GX–5, at 124. On the day of the meeting, the *Wall Street Journal* published an article reporting on the O'Brien lawsuit. *Nannes* GX–5, at 128–129; GX–14. *(See* Findings of Fact ¶ 14, *supra).*

105. During the meeting, Nannes learned that O'Brien had raised antitrust concerns in February 2002, after discovering the April 10, 2001 memorandum from Jansen to Wingfield. Nannes could not determine from the face of the document whether it reflected a collusive agreement or lawful conscious parallelism.[1] *Nannes*

GX–5, at 129–30, 163–64; *Nannes* GX–6, at 106.

106. At the meeting, Nannes reviewed the Corporate Leniency Program of the Antitrust Division (the "Division") with Cooperman. Cooperman authorized him to contact the Division to explore the possibility of participation in the Program. *Nannes* GX–5, at 131–33.

### VII. The Corporate Leniency Program

107. The Division adopted a revised Corporate Leniency Policy in August 1993 that provided an opportunity and incentive for companies to cooperate with its criminal investigations into violations of the antitrust laws. *See* Testimony of James Griffin *("Griffin ")* GX–5, at 189.

108. Under the Corporate Leniency Program, the Division would agree not to prosecute companies that report their illegal antitrust activity to the Division and meet all of the Program's conditions. *See* GX–3, Preamble.

109. Only the first company per conspiracy to report the illegal activity is eligible to qualify for leniency. GX–3, at 1–2.

110. In order to qualify for the Corporate Leniency Program, a company must represent that "upon its discovery of the illegal activity being reported, [it] took prompt and effective action to terminate its part in the activity." GX–3, at 1–3 ¶ A.2, ¶ B.3. In addition, the company must provide full, continuing and complete cooperation to the Division in connection with the activity being reported. GX–3, at 3 ¶ B.4.

111. On November 22, 2002, the Division obtained and read a copy of the November 22, 2002, *Wall Street Journal* arti-

---

1. Conscious parallelism is a lawful practice whereby, for example, parcel tanker shipping companies determine not to seek competitors' customers for independent business reasons

(such as fear of retaliation), and not due to any collusive agreements. *See Testimony of James Griffin* GX–7, at 58; *Van Westenbrugge* 6/14/07, at 211–12.

cle reporting O'Brien's lawsuit. GX–14; *Griffin* GX–5, at 197.

112. When it entered into the Conditional Leniency Agreement with Stolt–Nielsen on January 15, 2003, the Division was aware of the allegations in O'Brien's original and amended complaints, copies of which it previously had obtained. *See* Government's Proposed Findings of Fact, at ¶ 331.

### VIII. Stolt–Nielsen Seeks Conditional Leniency

113. After receiving authorization from Cooperman, Nannes telephoned Deputy Assistant Attorney General Griffin and left a voicemail message for him and for his subordinate, Scott Hammond. *Nannes* GX–5, at 133.

114. Over a series of telephone calls beginning on November 24, 2002, Nannes confirmed that the Antitrust Division had not granted amnesty to any prior applicant in the parcel tanker industry. *Nannes* GX–5, at 137–38. Nannes learned that the Division had begun an investigation as a result of the *Wall Street Journal* article published on Friday, November 22, 2002. *See* GX–5, at 197–99; GX–14.

115. At a meeting held with Griffin and other Division attorneys on December 4, 2002, Nannes was told that if Stolt–Nielsen had fired O'Brien for exposing antitrust violations, it would not qualify for leniency. Nannes stated that O'Brien was not terminated but departed voluntarily, and further explained that Stolt–Nielsen had heeded O'Brien's concerns by implementing a revised Antitrust Compliance Policy. *Nannes* GX–5, at 139–40; *see also Griffin* GX–5, at 204. The Division does not base its revocation of Stolt–Nielsen's leniency

on the circumstances of O'Brien's departure.

116. Nannes showed the Division e-mail messages from March and April 2002 in which Stolt–Nielsen had notified various parties of its Antitrust Compliance Program. *Griffin* GX–5, at 202–03.

117. As Griffin acknowledged, Nannes never represented to the Division that Stolt–Nielsen's participation in the illegal activity had ceased in March 2002, nor was he requested to do so. *See Griffin* GX–7, at 4; *Nannes* GX5, at 145–46; *Nannes* GX–6, at 75–76, 93.

118. At the December 4, 2002 meeting, Griffin asked Nannes whether Stolt–Nielsen would waive the attorney-client privilege for the purpose of allowing the Division to interview O'Brien. *Griffin* GX–5, at 204–05. Stolt–Nielsen declined to waive the privilege. *Griffin* GX–5, at 204–05.

119. During the meeting, Nannes was told that the Division had a source it wanted to contact regarding the O'Brien allegations. *Nannes* GX–5, at 142. The Division explained that "pending that process" Stolt–Nielsen had provisionally been granted a marker [2] and that the Division would protect Stolt–Nielsen's place as the first company to report the illegal activity. *Nannes* GX–5, at 142.

120. Following the December 4, 2002 meeting, the Division conducted its own investigation before deciding to accept Stolt–Nielsen into the Corporate Leniency Program. *Nannes* GX–5, at 148–49.

### IX. The Division Grants Stolt–Nielsen A "Marker"

121. On December 17, 2002, Griffin informed Nannes that the Division had conducted a sufficient investigation to be com-

---

**2.** Receipt of a "marker" secures an applicant's first place in line for the Corporate Leniency Program.

fortable going forward and that Stolt–Nielsen's request for a marker had been granted. *Nannes* GX–5, at 148–49.

122. Griffin also stated that the Division would not require Stolt–Nielsen to waive the attorney-client privilege. *Nannes* GX–5, at 149.

123. Upon receipt of the marker, Nannes began an independent investigation. He interviewed 18 to 20 Stolt–Nielsen employees who informed him about the existence of customer-allocation lists. *Nannes* GX–5, at 152–53; *Pickering* 5/31/07, at 126–27.

124. Cooperman, Lee, and Wingfield instructed their subordinates to cooperate fully with Nannes' investigation and to be completely truthful. *See Wingfield* 6/6/07, at 86; *Harrison* 5/31/07, at 257–58; *Pickering* 5/31/07, at 125, 202–03; *Jansen* 6/13/07, at 243.

125. During his investigation, Nannes met with Wingfield, who explained the operation of the customer-allocation conspiracy and provided Nannes with his journals covering 2001–2002 as well as "partial lists" identifying customers allocated to one company under the agreement. *Wingfield* 6/5/07, at 116–18, 120–22; *Nannes* GX–5, at 156–57.

126. Upon receipt of the partial lists from Wingfield, Nannes contacted the Division to move up the date for the proffer. *See Nannes* GX–5, at 160–61.

127. Nannes asked Wingfield to locate any "combined lists" documenting the allocation of customers between Stolt–Nielsen and its co-conspirators. *Wingfield* 6/5/07, at 120; *Nannes* GX–5, at 161–62.

128. Wingfield then contacted Pickering, who was based in Singapore. With Pickering's assistance, Wingfield was able to locate a copy of the 1998 "combined list" behind the credenza in Wingfield's office, formerly occupied by Pickering. *Wing-field* 6/5/07, at 121–23; *Pickering* 5/31/07, at 127–28; *Nannes* GX–5, at 159–62.

129. Wingfield promptly turned over the 1998 combined list to Nannes. *Wingfield* 6/5/07, at 123–25. Nannes considered the combined list to be very strong evidence of a *per se* antitrust violation. *Nannes* GX–5, at 156–57.

130. Based on discussions with Nannes, Cooperman and Wingfield understood that the Corporate Leniency Program would protect them from criminal liability. *Nannes* GX–6, at 32.

### X. The Proffer

131. On January 8, 2003, Nannes made a proffer at the Division's Philadelphia Office. *Nannes* GX–5, at 164. As part of the proffer, Nannes described his investigation and the nature of the customer allocation conspiracy between Stolt–Nielsen and its competitors, and indicated that he had obtained copies of some of the customer allocation lists. *See Nannes* GX–5, at 165–67.

132. At the proffer, Nannes did not represent that the anticompetitive activity he was reporting had terminated on any specific date. *Nannes* GX–5, at 170; *Nannes* GX–6, at 19–20, 85 ("I didn't represent it [date of termination] because I was not asked. If I had been asked, I would have said I couldn't represent it.").

133. During and after his January 8, 2003 proffer, Nannes was asked whether certain employees, including Cooperman, Lee, Wingfield and Jansen, would cooperate with the Division if Stolt–Nielsen were to be admitted to the Corporate Leniency Program. Nannes responded that he had no reason to believe that the employees would not cooperate. *See Nannes* GX–5, at 170–71; 6/18/07 Stipulation, Docket No. 267.

134. The Division was aware that the individuals who had provided information that went into Nannes' proffer were still employed by Stolt–Nielsen, but did not state that Stolt–Nielsen was ineligible for leniency because it had not terminated them. *See Nannes* GX–5, at 170–71; *Nannes* GX–6, at 97–98; 6/18/07 Stipulation, Docket No. 267, ¶ 4.

## XI. The Conditional Leniency Agreement

135. On January 15, 2003, the Division and Stolt–Nielsen entered into a Conditional Leniency Agreement ("the Agreement"), drafted by the Division. The Agreement was based on the Division's Model letter in effect at the time. *Griffin* GX–5, at 196; DX–1; DX–3.

136. The Agreement was signed by Griffin on behalf of the Division and countersigned by Nannes as counsel for SNTG, and by Lee, as Chief Executive Officer of SNTG. *See* DX–1, at 4.

137. The Agreement distinguishes between the corporate parties (SNTG and its corporate affiliates) and the directors, officers and employees. *See* DX–1, at ¶¶ 3–4; *Griffin* GX–7, at 18–19, 30–31.

138. The preamble states that the Agreement "is conditional and depends upon [Stolt–Nielsen] satisfying the conditions set forth below." DX–1, Preamble.

139. In Paragraph 1(a) of the Agreement, Stolt–Nielsen certifies that it "took prompt and effective action to terminate its part in the anticompetitive activity being reported upon discovery of the activity." DX–1, at ¶ 1.

140. The term "discovery" is not defined in the Agreement. *See* DX–1.

141. "Discovery" is defined by the Division in its April 1, 1998 policy statement as occurring "at the earliest date on which either the board of directors or counsel for the corporation (either inside or outside)

were first informed of the conduct at issue." GX–4, at 3–4.

142. The Agreement does not specify a discovery date of the unlawful conduct.

143. The Division has never defined the phrase "prompt and effective action" as provided in Paragraph 1(a) of the Agreement. *See Griffin* GX–7, at 49.—

144. There is no reference in the Agreement to a March 2002 date, which the Division now asserts to be the date triggering Stolt–Nielsen's obligation to take "prompt and effective action." *See* DX–1.

145. There is no evidence that Cooperman or anyone at Stolt–Nielsen was advised that amnesty was dependent upon Stolt–Nielsen having ceased its anticompetitive activity in March 2002.

146. In the Agreement, the Division expressly promised "not to bring any criminal prosecution against [Stolt–Nielsen] for any act or offense it may have committed prior to the date of this letter [January 15, 2003] in connection with the anticompetitive activity being reported." DX–1, at ¶ 3.

147. Paragraph 5 of the Agreement contains an integration clause stating that "[t]his letter constitutes the entire agreement between the Antitrust Division and [Stolt–Nielsen], and supersedes all prior understandings, if any, whether oral or written, relating to the subject matter herein." DX–1, at ¶ 5.

148. The Agreement expressly preserves Stolt–Nielsen's attorney-client and work-product privileges. DX–1, at 1.

149. The Agreement covers anticompetitive conduct "in the parcel tanker industry involving transportation to and from the United States." DX–1, at 1.

150. In Paragraph 2 of the Agreement, Stolt–Nielsen agreed "to provide full, continuing and complete cooperation to the Antitrust Division in connection with the activity being reported." DX–1, at ¶ 2. This cooperation included: providing the Division "full exposition of all facts known to [Stolt–Nielsen]" regarding the activity being reported; providing all documents requested by the Division; "using its best efforts to secure" the full cooperation of its officers, directors and employees; facilitating these employees' appearance at interviews or for testimony; and making reasonable efforts to pay restitution to any injured parties. *See* DX–1, at ¶ 2(a)-(g).

151. Paragraph 4 of the Agreement provides that subject to Stolt–Nielsen's "full, continuing and complete cooperation," "current and former directors, officers and employees of [Stolt–Nielsen] who admit their knowledge of, or participation in, and fully and truthfully cooperate with the Antitrust Division in its investigation of the anticompetitive activity being reported, shall not be prosecuted criminally by the Antitrust Division for any act or offense committed prior to the date of this letter [January 15, 2003] in connection with the anticompetitive activity being reported." The penalty for an untruthful or noncooperating employee would be loss of personal immunity. *See* DX–1, at ¶ 4.

152. The only obligations imposed by the Agreement upon Stolt–Nielsen's directors, officers and employees, who were not separately represented by counsel, are set forth in Paragraph 4. They apply *prospectively*, and consist of the following:

(a) producing ... all documents and records, including personal documents and records ... requested by attorneys and agents of the United States;

(b) making himself ... available for interviews ... upon the request of attorneys and agents of the United States;

(c) responding fully and truthfully to all inquiries of the United States ...;

(d) Otherwise voluntarily providing the United States with any materials or information, not requested in (a)-(c) of this paragraph, that he or she may have relevant to the anticompetitive activity being reported; and

(e) when called upon to do so by the United States, testifying in trial and grand jury or other proceedings ... fully, truthfully and under oath ...

153. The Division did not advise counsel for Stolt–Nielsen or Wingfield or Cooperman personally that Stolt–Nielsen employees were obligated to appear for interviews with the Division or otherwise provide information without being asked or subpoenaed. *See* 6/19/07 Stipulation, Docket No. 269; 6/18/07 Stipulation, Docket No. 268.

154. Neither Cooperman nor Wingfield has ever refused to be interviewed or to cooperate with the Division.

155. Cooperman satisfied his cooperation obligations under Paragraph 4 of the Agreement.

156 Wingfield satisfied his cooperation obligations under Paragraph 4 of the Agreement.

157. Neither Wingfield nor Cooperman was separately represented by counsel, nor was either told that by providing incriminating information to the Division, he would be subjected to criminal liability. *See Nannes* GX–5, at 158–59; *Nannes* GX–6, at 29–30.

158. Paragraph 5 of the Agreement includes an integration clause providing that "This letter constitutes the entire agreement between the Antitrust Division and [Stolt–Nielsen], and supersedes all prior

understandings, if any, whether oral or written, relating to the subject matter herein." DX–1, at ¶ 5.

159. O'Brien's amended complaint accuses Stolt–Nielsen of illegal antitrust violations purportedly ongoing as of November 2002. *See* 6/12/07 Stipulation, Docket No. 241; *Griffin* GX–7, at 46–47.

160. On January 8, 2003, one week before executing the Agreement, the Division inquired whether O'Brien's allegations should be disregarded as those of "just a disgruntled employee," and Nannes declined to make such a representation. *Nannes* GX–5, at 169.

161. When the Division accepted Stolt–Nielsen into the Corporate Leniency Program, it was aware that Stolt–Nielsen and Cooperman had not conducted an independent investigation in early 2002, had not reported past antitrust violations in early 2002, and had been accused publicly of ongoing antitrust violations. *See* 6/12/07 Stipulation, Docket No. 241, ¶ 1; GX–10A ¶¶ 9–10; GX–10B ¶¶ 9–10.

## XII. Stolt–Nielsen Provides the Division with Incriminating Evidence

162. In a letter dated January 31, 2003, the Division requested limited categories of specified documents, including the customer allocation lists, and asked to interview an employee of Stolt–Nielsen "familiar with the parcel tanker shipping business to and from the United States." DX–4, at 1, 3.

163. On February 4, 2003, Stolt–Nielsen produced over 6,000 pages, including customer lists, employee journals of Wingfield, Pickering and others, and employee expense reports keyed to the dates of conspiratorial meetings between competitors. *See Nannes* GX–6, at 8–10.

164. Nannes arranged for interviews on February 5, 2003, of Jansen and Pickering. *Nannes* GX–6, at 5, 7–8; *Pickering* 5/31/07, at 129–30. The Division provided each with a letter stating that company employees who fully cooperated with the investigation would be immune from prosecution for any act or offense committed prior to January 15, 2003, the date of the Agreement. *See* DX–6.

165. During his initial interview with the Division on February 5, 2003, Jansen represented that unlawful conduct ended in March 2002. *Jansen* 6/13/07, at 136–37. At the time of his interview, Jansen was not aware of the significance of the March 2002 date. *Jansen* 6/13/07, at 225–27. After the Division suspended Stolt–Nielsen's cooperation obligations, and after the Division threatened to revoke Jansen's personal immunity, he was interviewed again, at which time he recanted his earlier statements and claimed that the conspiracy continued after March 2002. *See Jansen* 6/13/07, at 226–28.

166. The Division did not request an interview with Wingfield or Cooperman. *Nannes* GX–6, at 14; *Griffin*, GX–5, at 218; *Wingfield* 6/5/07, at 131; 6/18/07 Stipulation, Docket No. 268.

167. On February 18, 2003, the Division sent Nannes a comprehensive document request. DX–8; *Nannes* GX–6, at 15–17.

168. By April 8, 2003, Stolt–Nielsen produced a total of approximately 25,000 pages of responsive documents, including numerous iterations of the customer-allocation lists. *See Nannes* GX–6, at 17.

169. The Division accepted incriminating information from Stolt–Nielsen prior to verifying fully the company's representation of prompt and effective action in Paragraph 1(a). *See Griffin* GX–7, at 39.

170. On February 19, 2003, the European Commission conducted dawn raids seeking evidence of antitrust violations at

the offices of Odfjell. *See Testimony of Morton Nystad ("Nystad")* 6/11/07, at 164–65; *Haugsdal* 6/12/07, at 132–34; *Nilsen* 6/19/07, at 141–42.

171. On February 25, 2003, Stolt–Nielsen issued a press release stating that it was "cooperating with competition authorities in the European Union" and had been "granted conditional immunity from imposition of fines." GX–17.

172. Odfjell approached the Division to cooperate after the European dawn raids and after learning of Stolt–Nielsen's cooperation with the antitrust authorities. *See Griffin* GX–7, at 32; *Nilsen* 6/19/07, at 142–43; *Sjaastad* 6/20/07, at 94, 132, 159, 167–69.

### XIII. The Division Successfully Prosecutes Odfjell and Jo Tankers

173. Using the information provided by Stolt–Nielsen and its employees, the Division secured guilty pleas from Stolt–Nielsen's co-conspirators in the customer-allocation conspiracy.

174. Odfjell was fined $42.5 million. GX–18A; *Nystad* 6/11/07, at 172. Odfjell CEO Sjaastad was sentenced to four months in prison and fined $250,000. GX–18B; *Sjaastad* 6/20/07, at 92. Odfjell Vice–President Nilsen was sentenced to three months in prison and fined $25,000. GX–18C; *Nilsen* 6/15/07, at 119.

175. Jo Tankers was fined $19.5 million. GX–19A; *Finlay* 6/14/07, at 119. Jo Tankers' former co-managing director, Van Westenbrugge, was sentenced to three months in prison and fined $75,000. GX–19B; *Van Westenbrugge* 6/14/07, at 206–07.

176. When Stolt–Nielsen approached the Division in November 2002 to report its antitrust violations, the Division did not have sufficient evidence to sustain a conviction of any company in the parcel tank-

er shipping industry. *See Griffin*, GX–7, at 25, 47. The customer-allocation lists provided by Stolt–Nielsen as part of the Agreement were the "smoking guns" used by the Division to secure multiple convictions and fines. *See id.* at 63–64.

### XIV. The Division Revokes Stolt–Nielsen's Conditional Leniency

177. On April 8, 2003, the Division notified Stolt–Nielsen that it had obtained evidence that Stolt–Nielsen "did not terminate its part in the illegal activities in or about March 2002," "continued its activities until at least as late as the second half of 2002," and thus had not met the conditions for leniency set forth in the Agreement. Without ever speaking with either Wingfield or Cooperman, the Division suspended Stolt–Nielsen's obligation to cooperate under the Agreement pending further investigation. *See* DX–11. None of the defendants was given an opportunity to respond to the Division's allegations. *See Griffin* GX–5, at 218.

178. When it issued its April 8, 2003 suspension letter, the Division had not yet interviewed *any* Odfjell employees. The only co-conspirator with whom it had spoken was Finlay of Jo Tankers. *See* 6/29/07 Stipulation, Docket No. 275.

179. In exchange for his assistance, Finlay obtained immunity from the Division and avoided both incarceration and fines. *See Finlay* 6/14/07, at 125–26, 150; GX–94.

180. On June 24, 2003, Wingfield was arrested. *See Wingfield* 6/5/07, at 108.

181. The Division did not communicate with Wingfield before arresting him. *See Griffin* GX–6, at 116.

182. By letter dated March 2, 2004, the Division revoked Stolt–Nielsen's conditional leniency. DX–20.

183. At no time did Cooperman, Wingfield, or anyone at Stolt–Nielsen refuse to cooperate with the Division. Each was at all times available to be interviewed or to provide information to the Division.

### XV. The Civil Proceedings

184. In February 2004, Stolt–Nielsen and Wingfield commenced a civil action in this Court for declaratory and injunctive relief barring the Division from prosecuting the company or its executives. The Honorable Timothy J. Savage held a hearing on April 13 and 14, 2004, during which Nannes and Griffin testified. *See* 6/4/07 Stipulation, Docket No. 235 (April 13–14, 2004 Hearing Transcript).

185. Cooperman did not participate in the civil proceedings, as the Division did not advise him that he was a target of its investigation until March 27, 2006. *See* 6/18/07 Stipulation, Docket No. 268, ¶ 7.

186. On January 14, 2005, Judge Savage issued findings of fact and a memorandum opinion concluding that Stolt–Nielsen had not breached the Agreement and enjoining the Division from revoking Stolt–Nielsen's conditional leniency. *Stolt–Nielsen S.A. v. United States,* 352 F.Supp.2d 553 (E.D.Pa.2005).

187. The Third Circuit reversed on the ground that the principle of separation of powers precluded the Court from enjoining the executive branch from indicting Stolt–Nielsen. *Stolt–Nielsen S.A. v. United States,* 442 F.3d 177 (3d Cir.2006).

188. The Third Circuit stated that if Stolt–Nielsen asserted the Agreement as a defense after indictment, the Court must: (1) consider the Agreement "anew"; (2) determine the date upon which Stolt–Nielsen "discovered" the anticompetitive activity it reported; (3) consider the "subsequent actions" of Stolt–Nielsen and Wingfield; and (4) determine whether Stolt–Nielsen fulfilled its obligation to take "prompt and effective action to terminate its part in the anticompetitive activity being reported." *Id.* at ·187 n. 7.

### XVI. Conclusion—No Evidence of Collusion

189. Odfjell and Jo Tankers witnesses had a strong incentive to lie both in order to retaliate against Stolt–Nielsen for implicating them in a criminal conspiracy, and in order to obtain immunity or lesser punishment from the Division.

190. Each Odfjell and Jo Tankers witness who testified did so in return for individual or corporate cooperation agreements that promised immunity or a reduced sentence in exchange for testimony against Stolt–Nielsen: Nystad, Haugsdal, Knutsen, and Edvardsdal testified pursuant to Odfjell's plea agreement with the Division. *See Nystad* 6/11/07, at 110–11, 170–71; *Haugsdal* 6/12/07, at 83, 154–55; *Knutsen* 6/13/07, at 14; *Edvardsdal* 6/15/07, at 5. Finlay and Jansen testified pursuant to individual immunity agreements. *See Finlay* 6/14/07, at 125–26; *Jansen* 6/13/07, at 86; DX–6. Nilsen, Sjaastad and Van Westenbrugge testified pursuant to their plea agreements. *See Nilsen* 6/15/07, at 161, 165–66; *Sjaastad* 6/20/07, at 92–93, 141; *Van Westenbrugge* 6/14/07, at 206–08.

191. The Division makes no allegation of any antitrust violations after November 2002. Moreover, it is undisputed that Stolt–Nielsen fully complied with its obligations to cooperate with the Division's investigation of the conspiracy after November 2002. *See Nannes* GX–6, at 5–18.

192. There is no evidence that Cooperman or Wingfield had any personal motive, financial or other, to continue the customer-allocation conspiracy after March 2002 in contravention of the express Stolt–Nielsen policy directives issued in February and March 2002.

193. The evidence reveals that Stolt–Nielsen took "prompt and effective action to terminate its part in the anticompetitive activity being reported upon discovery of the activity" in February 2002. *See* DX–1, at ¶ 1(a); *see* Findings of Fact ¶¶ 18–39.

194. There is no credible evidence that Stolt–Nielsen or any of its employees participated in the customer allocation conspiracy after March 2002.

195. There is no credible evidence that Wingfield engaged in conspiratorial conduct after March 2002.

196. There is no evidence that Cooperman was aware of or engaged in any conspiratorial conduct after March 2002. *See Jansen* 6/13/07, at 247–48; *Division Summation* 6/21/07, at 231, 253–54.

197. There is no credible evidence that Stolt–Nielsen made any misrepresentations in the Agreement.

198. There is no credible evidence that any of the named defendants engaged in any conduct violative of the Agreement.

199. There is no credible evidence that Stolt–Nielsen failed to provide "full, continuing and complete cooperation" to the Division in compliance with its obligations under Paragraph 2 of the Agreement.

200. There is no evidence that Cooperman or Wingfield failed to cooperate with the Division or otherwise failed to meet any obligation under Paragraph 4 of the Agreement.

## CONCLUSIONS OF LAW

### I. *Background*

1. On September 6, 2006, a federal grand jury sitting in the Eastern District of Pennsylvania returned an indictment charging Stolt–Nielsen, S.A., Stolt–Nielsen Transportation Group, Samuel Cooperman, and Richard Wingfield (collectively, "Defendants") with violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

2. On November 22, 2006, Defendants filed motions, pursuant to Rule 12(b)(2) of the Federal Rules of Criminal Procedure, to dismiss the Indictment, arguing that the Agreement precluded the Division from prosecuting them.

3. In accordance with the Third Circuit's directive, this Court held an evidentiary hearing in order to determine: (1) when Stolt–Nielsen "discovered" the anticompetitive conduct, (2) what actions Stolt–Nielsen and the individual defendants took thereafter, and (3) whether those actions constituted "prompt and effective action to terminate its part in the anticompetitive activity being reported." *Stolt–Nielsen,* 442 F.3d at 187 n. 7. The Court further sought to determine (1) whether Stolt–Nielsen provided "full, continuing and complete cooperation to the Antitrust Division in connection with the activity being reported," DX–1 ¶ 2, and (2) whether the individual defendants "fully and truthfully" cooperated with the Division. DX–1 ¶ 4.

4. The Court has assessed the credibility of each witness in this matter. *See, e.g., Harrod v. Cox,* 165 Fed.Appx. 988, 991 (3d Cir.2006) ("It is well within the discretion of the District Court as the trier of fact to assess the credibility of witnesses and to accept or reject their testimony accordingly.").

5. In assessing the credibility of a witness, "the trier of the fact may consider the witness' demeanor and manner while on the stand, the character of his testimony as being probable or improbable, inconsistencies, patent omissions and discrepancies in his testimony, or between the testimony of different witnesses, contradictory testimony, his interest in the outcome of the case, his relationship to the litigants, and many other factors bear-

ing upon the truthfulness or untruthfulness of the witness' testimony." *Young Ah Chor v. Dulles,* 270 F.2d 338, 341 (9th Cir.1959); *see also United States v. Isaac,* 134 F.3d 199, 204 (3d Cir.1998) ("We recognize that a witness who has been given a reward for cooperation has also been given an incentive to shade the truth or to lie."); *United States v. Sarivola,* 1994 WL 613259, at *2 (S.D.N.Y. Nov.4, 1994) (observing that factors to be weighed in assessing credibility include "a motive to shade the truth; whether the accounts given are inherently plausible or implausible; whether those accounts are corroborated or contradicted by independent evidence; the demeanor of the witnesses as they testified; and any other factors that might bear on credibility").

## II. *Principles of Interpretation*

6. Non-prosecution agreements are binding contracts. *United States v. Castaneda,* 162 F.3d 832, 835 (5th Cir.1998).

7. While general principles of contract law guide interpretation of non-prosecution agreements,"such agreements are unique and are to be construed in light of 'special due process concerns.' " *United States v. Baird,* 218 F.3d 221, 229 (3d Cir.2000).

■ 8. The Division bears the burden of demonstrating that Stolt–Nielsen *materially* breached the Agreement. *See United States v. Fitch,* 964 F.2d 571, 574–575 (6th Cir.1992). The Division urges the Court to apply a "preponderance of the evidence" standard, a standard applied by a number of courts evaluating alleged breaches of plea agreements. Defendants propose a "clear and convincing" standard of proof. *See United States v. Skalsky,* 621 F.Supp. 528, 530 (D.N.J.1985), *aff'd,* 857 F.2d 172, 175 (3d Cir.1988). The Court's findings of fact and conclusions of law would be unchanged regardless of which of the two standards is applied.

■ 9. In determining whether an immunity agreement has been materially breached, the court must consider whether the non-breaching party received the benefit of the bargain, as well as the incriminating nature of the information provided by the defendant. *See Castaneda,* 162 F.3d at 837 ("[W]e have recognized that a breach is not material unless the non-breaching party is deprived of the benefit of the bargain."); *see also United States v. Fitch,* 964 F.2d 571, 575 (6th Cir.1992) (noting that in evaluating the Government's effort to rescind an immunity agreement on the basis of breach of contract, the most important factor is the incriminating nature of the information provided by the defendant) (citing *United States v. Johnson,* 861 F.2d 510, 513 (8th Cir.1988)).

10. Non-prosecution agreements, like any contract, require that each party fulfill its duty of good faith and fair dealing in its performance. *See, e.g., United States v. Frazier,* 340 F.3d 5, 11 (1st Cir.2003); *Isaac,* 141 F.3d at 483; *United States v. Abuhouran,* 161 F.3d 206, 212 (3d Cir. 1998).

11. The text of the Agreement must be strictly construed against the Government as the drafting party. *United States v. Gebbie,* 294 F.3d 540, 552 (3d Cir.2002); *see also United States v. Floyd,* 428 F.3d 513, 516 (3d Cir.2005); *United States v. Rivera,* 357 F.3d 290, 294–95 (3d Cir.2004).

12. The Court must determine whether the Government's conduct comported with "what was reasonably understood by defendant when entering" the Agreement. *Baird,* 218 F.3d at 229; *see also Santobello v. New York,* 404 U.S. 257, 262, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971) ("[A] constant factor is that when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or con-

sideration, such promise must be fulfilled.").

### III.  The Terms of the Conditional Leniency Agreement

13.  The Agreement preserves Stolt–Nielsen's attorney-client and attorney work-product privileges.  *See* DX–1, at 1; *Griffin* GX–7, at 47.

14.  Paragraph 5 of the Agreement contains an integration clause stating that "[t]his letter constitutes the entire agreement between the Antitrust Division and [Stolt–Nielsen], and supersedes all prior understandings, if any, whether oral or written, relating to the subject matter herein."  DX–1, at ¶ 5. *See In re Altro,* 180 F.3d 372, 375 (2d Cir.1999) ("[the] parol evidence rule forbids proof of an oral agreement that might add to or vary the terms of a written contract that was intended to embody the entire agreement between the parties" (citations omitted)).

15.  The Agreement imposed two requirements on Stolt–Nielsen: (1) to take prompt and effective action to terminate its part in the conspiracy, and (2) to provide full, continuing and complete cooperation to the Division.  *See* DX–1.

16.  In exchange, and subject to Stolt–Nielsen's performance of its obligations, the Division expressly agreed not to prosecute Stolt–Nielsen for any act or offense *occurring prior to January 15, 2003. See* DX–1, at ¶ 3.

17.  The Division expressly reserved the right to verify Stolt–Nielsen's representations.  *See*

18.  In Paragraph 1(a) of the Agreement, Stolt–Nielsen represented that it "*took prompt and effective action to terminate its part in the anticompetitive activity being reported upon discovery of the activity.*"  DX–1, at ¶ 1(a).  The representation was truthful.

19.  The phrase "prompt and effective action" was not defined in the Agreement.

20.  "Prompt," by its plain meaning, implies fast and diligent action, but did not require StoltNielsen immediately to terminate its anticompetitive conduct.  *See, e.g., Merriam Webster's Collegiate Dictionary* (10th ed.1996).

21.  The term "effective," by its plain meaning, requires the action to produce the intended effect.  *See, e.g., Black's Law Dictionary* (8th ed.2004).

22.  The term "discovery" was not defined in the Agreement.  The term has been defined by the Division in the 1998 Policy Statement as occurring "at the earliest date on which either the board of directors or counsel for the corporation (either inside or outside) were first informed of the conduct at issue."  GX–4, at 3–4.

23.  The Agreement does not specify the date upon which Stolt–Nielsen "discovered" the anticompetitive activity it reported.  *See* DX–1.

24.  In Paragraph 2 of the Agreement, Stolt–Nielsen agreed "to provide full, continuing and complete cooperation to the Antitrust Division in connection with the activity being reported."  DX–1, at ¶ 2(a)-(g).  Stolt–Nielsen has fulfilled its obligations under this paragraph.

### A.  "Prompt and Effective Action" upon "Discovery"

■ 25.  O'Brien's discovery of the Jansen memo left anonymously on his desk in January 2002 and his communication of that discovery to Cooperman in February 2002 constituted "discovery" for purposes of the Agreement.  This finding is consistent with the meaning attributed to the term in the Division's April 1, 1998 Policy Statement.  *See* GX–4, at 3–4.

26.  O'Brien's "discovery" of the antitrust conspiracy triggered Stolt–Nielsen's

obligation to take "prompt and effective action" to terminate its role in the conspiracy.

27. By promptly instituting the Antitrust Compliance Policy, including issuing and distributing the Handbook, holding seminars, requiring all employees to certify compliance with the new policy, and ensuring such compliance, Stolt–Nielsen took "prompt and effective action to terminate its part in the anticompetitive activity being reported."

28. There is no credible or plausible evidence that Stolt–Nielsen made any misrepresentations in the Agreement.

29. There is no credible or plausible evidence that Stolt–Nielsen breached any provision of the Agreement.

### B. "Directors, Officers, and Employees"

30. The Agreement distinguishes between the duties of the company and the duties of its directors, officers, and employees. *See* DX–1, at ¶¶ 1–2, 4.

31. On January 15, 2003, Wingfield and Cooperman were "directors and/or officers" of Stolt–Nielsen, and therefore were intended third-party beneficiaries of the Agreement.

32. Paragraph 4 of the Agreement provides that subject to Stolt–Nielsen's "full, continuing and complete cooperation," Stolt–Nielsen's directors, officers and employees will not be prosecuted for their participation in the conspiracy if they fulfill individual cooperation obligations. *See* DX–1, at ¶ 4.

33. It was reasonable for Stolt–Nielsen and its officers and directors to have understood the language of the Agreement to mean that if they cooperated with the Division, they would be immune from prosecution for any act committed before January 15, 2003.

34. Paragraph 4 of the Agreement does not contain a "prompt and effective action" obligation. *Compare* DX–1 ¶ 4 *with* ¶ 1.

35. The Division may not prosecute Stolt–Nielsen, Wingfield, or Cooperman on the basis of facts known to it at the time it entered into the Agreement. *See United States v. Roe,* 445 F.3d 202, 207 (2d Cir. 2006); *United States v. Knights,* 968 F.2d 1483, 1488 (2d Cir.1992).

36. In reliance on the promise of immunity, Wingfield and Cooperman relinquished Fifth Amendment rights and provided incriminating information that enabled the Division to successfully prosecute Odfjell and its executives Sjaastad and Nilsen, and Jo Tankers and its executive Van Westenbrugge.

37. The Division unilaterally suspended the Agreement without interviewing Wingfield or Cooperman, or providing either of them an opportunity to respond to the Division's reasons for the suspension and revocation.

38. There is no evidence that Cooperman or Wingfield failed to cooperate with the Division or otherwise failed to meet any obligation under the Agreement.

### IV. The March–November 2002 Period

39. Section 1 of the Sherman Act "reaches unreasonable restraints of trade effected by a contract, combination . . . or conspiracy between separate entities, and does not reach conduct that is wholly unilateral." *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 753, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984) (internal quotations omitted); *see also Edward J. Sweeney & Sons, Inc. v. Texaco, Inc.,* 637 F.2d 105, 111 (3d Cir.1980) ("Unilateral action, no matter what its motivation, cannot violate [Section 1 of the Sherman Act]."); *Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 465 (3d Cir.1998).

40. Post–March 2002 efforts by Odfjell and Jo Tankers to continue anticompetitive activity, without collaboration from Stolt–Nielsen, do not amount to a breach of the Agreement by Stolt–Nielsen. *See United States v. Andreas*, 216 F.3d 645, 669 (7th Cir.2000) ("[A] defendant's subjective intent is a required element of a criminal antitrust violation, and [therefore] a defendant who pretended to agree but did not intend to honor the agreement could not be convicted of a crime.").

41. Post March–2002 communications between Stolt–Nielsen and its competitors, including meetings between company executives, did not violate Stolt–Nielsen's Antitrust Compliance Policy. The Policy did not bar contact with competitors, and there were a variety of topics, such as sublets, relets, and co-service agreements, that were lawful for discussion. *See* DX–325, at § 5. Such communications did not render inaccurate or false Stolt–Nielsen's representation that it took prompt and effective action upon discovery to terminate its part in the conspiracy.

## V. Conclusion

42. The Division has failed to demonstrate that Stolt–Nielsen breached the Agreement: (1) there is no credible evidence that the customer allocation conspiracy between Stolt–Nielsen, Odfjell, and Jo Tankers continued past March 2002; (2) Stolt–Nielsen took prompt and effective action upon O'Brien's discovery to terminate its part in the anticompetitive activity being reported; (3) there is no evidence that Stolt–Nielsen failed "to provide full, continuing, and complete cooperation to the Antitrust Division" as required by the Agreement, *see* DX–1 ¶ 2; and (4) there is no evidence that the individual defendants failed to admit their knowledge of or participation in the anticompetitive activity or to "fully and truthfully cooperate" with the Division. *See* DX–1 ¶ 4.

43. Stolt–Nielsen's efforts in instituting and enforcing the Antitrust Compliance Policy beginning in late February-early March 2002 constituted "prompt and effective action to terminate its part in the anticompetitive activity being reported" upon O'Brien's "discovery" of the activity.

44. By successfully prosecuting Odfjell, Jo Tankers, and various individuals on the basis of information provided by Stolt–Nielsen and its employees, and by dismantling the cartel in the parcel tanker shipping industry, the Division received the benefit of its bargain. *See Fitch*, 964 F.2d at 575 ("[defendant] supplied the government with enough information to allow it to secure a multicount indictment against numerous individuals. He also assisted the investigation in various other ways. Therefore, we must conclude that the government received the benefit of its bargain, and the agreement should be enforced."); *Castaneda*, 162 F.3d at 839–40.

45. The Division has no reasonable basis upon which to void or revoke the Agreement because it has not demonstrated any breach by Stolt–Nielsen or the individual defendants. Accordingly, the Indictment will be dismissed.